**State of NEVADA, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF ENERGY, and its secretary, Samuel Bodman, Defendants.**

**No. 3:06–CV–153–ECRRAM.**

United States District Court, D. Nevada.

Sept. 27, 2007.

State of Nevada: Charles J. Fitzpatrick, Joseph R. Egan, and Robert J. Cynkar, Egan Fitzpatrick Malsch and Cynkar, PLLC, San Antonio, TX, Marta A. Adams, Nevada Attorney General's Office, Carson City, for Plaintiffs or Petitioners.

United States Department of Energy and Secretary Samuel Bodman: Gregory W. Addington, U.S. Attorney's Office, Reno, for Defendants or Respondents.

## ORDER

EDWARD C. REED, District Judge.

This case concerns the State of Nevada's request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for copies of the Department of Energy's ("DOE's") draft license applications to the Nuclear Regulatory Commission ("NRC") for the proposed Yucca Mountain nuclear waste repository. Before the Court are Defendants' Motion for Summary Judgment (# 24) ("DMSJ") and Plaintiff's Motion for Summary Judgment (# 39) ("PMSJ"). For the reasons set out below, Defendants'

motion (# 24) is **GRANTED** and Plaintiff's motion (# 39) is **DENIED**.

## I. BACKGROUND

The application to the Nuclear Regulatory Commission ("NRC") for the proposed nuclear waste repository will be made by the Department of Energy ("DOE") pursuant to unique procedures created pursuant to the Nuclear Waste Policy Act.

### A. The Nuclear Waste Policy Act

In 2004, the D.C. Circuit broadly affirmed the constitutionality of the selection of the Yucca Mountain site, but it partially vacated Environmental Protection Agency regulations created as part of the approval process. *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C.Cir.2004) (en banc). In that decision, the D.C. Circuit summarized at some length the convoluted legal backdrop for the present case:

In 1982, responding to growing quantities of radioactive waste and their potentially deadly health risks, Congress enacted the Nuclear Waste Policy Act (NWPA), directing the federal government to assume responsibility for permanently disposing of the nation's nuclear waste. Pub.L. No. 97–425, 96 Stat. 2201 (1982) (codified as amended at 42 U.S.C. §§ 10101–10270 (2000)). The NWPA put the United States on course to using geologic repositories buried deep below the earth's surface to house its nuclear waste....

The NWPA assigned distinct regulatory roles to the Department of Energy, the Environmental Protection Agency, and the Nuclear Regulatory Commission. Congress charged DOE with selecting, designing, and ultimately operating the repository. *See id.* §§ 10132–10134 (2000). It required EPA to establish generally applicable standards for protecting the environment from releases of

radioactive materials, *id.* § 10141(a) (2000), and directed NRC to assume responsibility for licensing a DOE-proposed repository, *id.* § 10141(b).

The NWPA also established a multistage process for DOE to select an appropriate host site. The Act required the Secretary of Energy to begin by issuing general site-selection guidelines, *id.* § 10132(a), that DOE would then use to determine which candidate sites to recommend for intensive investigation, known as "site characterization," *id.* § 10132(b). Based on these guidelines, the Secretary was directed to nominate at least five sites, *id.* § 10132(b)(1)(A), and then to narrow the field to three for the President's consideration, *id.* § 10132(b)(1)(B).

Once the President approved the nominated sites, the Secretary was required to undertake site-characterization activities at each location. NWPA § 113(a) (codified as amended at 42 U.S.C. § 10133(a)). The NWPA also directed DOE, as part of its site-characterization program, to issue "criteria" for determining whether the candidate sites were "suitab[le]" for housing a waste repository. 42 U.S.C. § 10133(b)(1)(A)(iv). After completing the intensive site-characterization process, the Secretary was authorized to submit to the President, together with a final environmental impact statement, a recommendation that he approve one of the suitable sites for development. NWPA § 114(a)(1) (codified as amended at 42 U.S.C. § 10134(a)(1)).

Under the NWPA, once the President approved a site, he would then transmit his recommendation to Congress. *Id.* § 114(a)(2) (codified as amended at 42 U.S.C. § 10134(a)(2)). The state within which the recommended site was located could then submit a "notice of disapproval" to Congress, an action that would effectively end the development process with respect to that site unless Congress passed a joint resolution overriding the state's disapproval and approving the site. *See* 42 U.S.C. § 10136(b)(2) (2000).

Pursuant to this statutory regime, DOE promulgated site-selection guidelines in 1984 and applied them to nominate five candidate sites for characterization. Based on these guidelines, the Energy Secretary then recommended three sites to the President: Deaf Smith County, Texas; Hanford, Washington; and Yucca Mountain, Nevada. *See Nevada v. Watkins,* 939 F.2d 710, 713 (9th Cir. 1991). The President then approved each for characterization. *Id.*

In 1985, EPA promulgated 40 C.F.R. part 191, general health and safety standards to govern an eventual waste repository. EPA later revised these standards in response to a First Circuit decision remanding aspects of the regulation. *See Natural Res. Def. Council, Inc. v. United States EPA,* 824 F.2d 1258 (1st Cir.1987) (*NRDC v. EPA*). NRC then issued generic licensing standards in 10 C.F.R. part 60.

In 1987, however, because characterizing three separate sites was becoming both costly and time-consuming, Congress departed from the NWPA's original site-selection scheme and directed, through the Nuclear Waste Policy Amendments Act (NWPAA), that the nation's nuclear waste program focus exclusively on Yucca Mountain, Nevada. *See* Pub.L. No. 100–203, §§ 5001–5065, 101 Stat. 1330, 1330–227 to 1330–255 (1987) (codified in scattered sections of 42 U.S.C.). Located in the arid Nevada desert approximately 100 miles northwest of Las Vegas, Yucca Mountain sits on the Nevada Test Site, the nation's former nuclear bomb testing range. Under the NWPAA, Yucca became the only site

that DOE could lawfully characterize. *See* 42 U.S.C. § 10133(a) (requiring the Energy Secretary to "carry out ... appropriate site characterization activities at the Yucca Mountain site"); *id.* § 10172(a)(1)-(2) (2000) ("The Secretary shall provide for an orderly phase-out of site specific activities at all candidate sites other than the Yucca Mountain site ... [and] shall terminate all site specific activities (other than reclamation activities) at all candidate sites, other than the Yucca Mountain site....").

. . . .

DOE also focused its attention on the Nevada site, issuing new site-suitability criteria specific to Yucca Mountain. *See* 10 C.F.R. pt. 963 (2004). Pursuant to these criteria and a final environmental impact statement, the Energy Secretary found Yucca Mountain suitable for a repository, concluding that a Yucca facility is "likely to meet applicable radiation protection standards." Secretary's Recommendation at 26. Based on that finding, the Energy Secretary recommended Yucca Mountain to the President for development as the nation's underground nuclear waste repository. *Id.* at 6. Pursuant to NWPA procedures, the President then recommended Yucca to Congress. Objecting, Nevada submitted a notice of disapproval, to which Congress responded by passing a joint resolution approving the development of a repository at Yucca Mountain. *See* Pub.L. No. 107–200, 116 Stat. 735 (2002) (codified at 42 U.S.C. § 10135 note (Supp. IV 2004)).

*Nuclear Energy Institute, Inc.,* 373 F.3d at 1258–61.

The President's signature on the joint resolution in June of 2002 triggered a 90 day deadline for DOE to file an application with the NRC for the site. It appears that this deadline would have fallen in September 2002. *See* NWPA § 114(b) (codified as amended at 42 U.S.C. § 10134(b)). The DOE, however, apparently made December 2004 its target date for submitting its application. *See* Memorandum and Order of the Pre–License Application Presiding Officer Board ("PAPO Order"), *In re Dep't of Energy,* 62 N.R.C. 478, 2005 WL 5716382 (Sept. 22, 2005), rev'd by Memorandum and Order of the NRC ("NRC Order"), *In re Dep't of Energy,* 2006 WL 1704522 (Feb. 2, 2006).

**B. The Yucca Mountain Pre–Application Process**

Because the pre-application process provides the specific backdrop for this case, we pause to outline that process. Under the NWPA, the NRC has three years to approve or disapprove the application for a repository (i.e., the application for the Yucca Mountain site, 42 U.S.C. § 10133(a)) once the application is filed. NWPA § 114(d) (codified as amended at 42 U.S.C.A. § 10134(d)). Because the three year schedule was perceived to be tight, the NRC promulgated Subpart J to Title 10, part 2 of the Code of Federal Regulations, which uniquely requires the applicant, the DOE, to file documents related to the application six months prior to filing the application for the license. *See* 10 C.F.R. § 2.1003. Also to facilitate speedy disclosure, the regulations created an electronic docketing system, which was formerly known as the Licensing Support System ("LSS"), 54 Fed.Reg. 14925 (Apr. 14, 1989), and is currently called the Licensing Support Network ("LSN"), 10 C.F.R. § 2.1001. The purpose of both the pre-application process and the docketing system is to facilitate "the comprehensive and early review of the millions of pages of relevant licensing material by the potential parties to the proceeding, so as to permit the earlier submission of better focused contentions resulting in a substantial sav-

ing of time during the proceeding[.]" *Id.* at 14926; *see also In re Dep't of Energy,* 60 N.R.C. 469, 471, 2004 WL 3247597 (Nov. 10, 2004) ("[U]nder this first-of-a-kind provision, initial discovery will precede a license application and should enable the parties to get off to a running start before the statutory 3–year period begins.").[1]

Pursuant to Subpart J, 10 C.F.R. § 2.1010, the NRC appointed a Pre–License Application Presiding Officer (PAPO) in July 2004, Order, *In re Dep't of Energy,* 60 N.R.C. 15, 2004 WL 1729788 (July 7, 2004),[2] the role and authority of which is to rule on "disputes over the electronic availability of documents [on the LSN], including disputes relating to claims of privilege . . . ." *Id.* at *2.

## C. Evidence Related to the Nature of the Draft Applications

On July 26, 2004, Bechtel–SAIC Company, LLC ("Bechtel"), the DOE's primary contractor, delivered a 5800 page draft application ("the Bechtel Draft Application") to DOE.[3] DOE in turn began the process of review and revision in preparation for filing. *See generally* PAPO Order, 2005 WL 5716382, at *5–*6, rev'd by NRC Order, 2006 WL 1704522.[4] In ruling on an administrative motion to compel, discussed *infra,* the PAPO Board concluded that a second draft had been completed by DOE in November 2004. PAPO Order, 2005 WL 5716382, at *10.

The DOE has submitted a brief, four-page declaration of W. John Arthur, III, the former Deputy Director of the Office of Civilian Radioactive Waste Management ("OCRWM"),[5] who states that he made the decision to deny Nevada's requests for the drafts because "release of the draft license application would interfere with the quality of DOE's decision-making processes for the draft license application and interfere with the DOE's ability to complete the license application." (Arthur Decl. ¶ 3(# 25).) Mr. Arthur acknowledges that Bechtel produced the July 2004 draft, (*id.* ¶ 6), but asserts that teams that included DOE employees worked on both drafts:

> The teams who worked on the two versions of the draft license application consisted of personnel from OCRWM, attorney's [sic] from DOE's Office of General Counsel; attorneys from Hunton & Williams LLP, DOE's outside licensing counsel; and employees and subcontractors of Bechtel–SAIC, LLC (BSC). BSC is the management and operating contractor that DOE retained to assist in preparation of the license application.

(Arthur Decl. ¶ 5(# 25).) He also asserts that "an iteration" of the draft was completed between July and September of 2004, but that the various sections worked on by the teams "were not reassembled." (*Id.* ¶¶ 7, 8.) He characterizes both versions as "working drafts," (*id.* ¶ 9), and he

---

1. The adjudication of the application may not begin prior to the DOE's compliance with the pre-application docketing and disclosure requirements. *See In re Dep't of Energy,* 60 N.R.C. 300, 2004 WL 2920194 (Aug. 31, 2004).

2. (Ex. 2, DMSJ (# 24–3).)

3. In its discovery responses, the DOE admits simply that both drafts are over 5000 pages.

(Ex. L, PMSJ (# 39).) The letter from Bechtel to DOE delivering the Draft Application and seeking a performance based incentive for doing so has been made a part of the record. (Ex. 6, DMSJ (# 24–7).)

4. (Exs. I and J, PMSJ (# 39).)

5. At oral argument Plaintiff's counsel mentioned in passing that Mr. Arthur is now deceased.

does not substantively distinguish between them.

We note that Mr. Arthur's brief declaration of the process is far more vague than the findings of the PAPO Board. Reviewing the record before it in ruling on an administrative motion to compel production, the PAPO Board concluded that in November 2004 the DOE had already completed the following steps in its License Application Management Plan: a "Technical Team Review Process," a "Technical Team Concurrence Review and Comment Resolution," "Resolution of Joint Comments," and "Final Concurrence;" the PAPO Board concluded that DOE had not reached the final pre-filing step of "submittal to DOE headquarters." PAPO Order, 2005 WL 5716382, at *8–*9.

Apparently due at least in part to adverse legal developments,[6] the DOE stopped trying to meet the December 2004 deadline. Edward Sproat, the director of OCRWM, testified before Congress on July 19, 2006 that his goal was to complete the final draft "no later than Monday June 30, 2008," (Ex. 8 at 4, DMSJ (# 24–9)), with the final application to be docketed by September 30, 2008. (*Id.* at 9.)

## C. The State of Nevada's Attempts to Obtain the Draft Applications

The State of Nevada has attempted to obtain the draft license application both via the NWPA and via FOIA. The state made its first request under FOIA for the Bechtel Draft Application in a letter dated August 24, 2004. (Ex. 9, DMSJ (# 24–10).) Specifically, the state requested "[t]he draft License Application (for Yucca Mountain project) which Margaret Chu discussed at the August 19, 2004 DOE/

NRC Management and QA meeting as having been submitted for its review by Bechtel SAIC to DOE." (*Id.*) On November 22, 2004, the DOE responded with a letter denying the request, stating that providing the draft would "chill the deliberative process" and was thus exempt under Exemption 5 of FOIA. (Ex. 10, DMSJ (# 24–11).) The State of Nevada did not administratively appeal this denial.

On January 28, 2005, Kenny Guinn, then Governor of the State of Nevada, sent a letter to the Secretary of Energy requesting several documents, including the Bechtel draft application. The letter specifically made this request pursuant to Section 117 of the NWPA. (Ex. 11, DMSJ (# 24–10).) On March 1, 2005, the Secretary denied the request citing the lack of a required written agreement between the State of Nevada and the Department of Energy under that statute. *See* 42 U.S.C. § 10137(c). The Secretary further stated that the letter would be construed as a FOIA request, reiterated the DOE's prior FOIA analysis, and finally noted that all disclosures would be made via the Licensing Support Network.

On June 6, 2005, the State of Nevada filed a motion to compel production of the Bechtel draft with the Pre–License Application Presiding Officer Board. *See* PAPO Order, 2005 WL 5716382, at *4 n. 1. On September 22, 2005, the PAPO Board granted the State of Nevada's administrative motion and ordered the filing of the draft application on the LSN pursuant to 10 C.F.R. § 2.1003, which requires the filing of certain types of "documentary material[s]" prior to the filing of the application. *See* 10 C.F.R. § 2.1001 (defining "docu-

---

6. *E.g.* Memorandum and Order, *In re Dep't of Energy*, 60 N.R.C. 300, 2004 WL 2920194 (Aug. 31, 2004) (granting the State of Nevada's motion to strike the Department's certifi-

cation that LSN production was complete, and effectively preventing the application from being filed for at least six months); *Nuclear Energy Institute*, 373 F.3d at 1315.

mentary material[s]");[7] § 2.1003 (requiring DOE to make "documentary material[s]" available on the LSN six months prior to the application). The PAPO Board rejected the DOE's argument that the "deliberative process" and "work product" privileges exempted the draft application from pre-application production. First, the PAPO Board noted that the deliberative process privilege was waived by regulation for documents that fell within the definition of documentary materials, 10 C.F.R. § 2.1006(c), and second, the PAPO Board also concluded that the application was not prepared "because of" litigation and was therefore not work product. PAPO Order, 2005 WL 5716382, at *4 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir.1998) ("[t]he 'because of' formulation ... withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.... [e]ven if such documents might also help in preparation for litigation") (alterations and omissions in original)); *see also* 10 C.F.R. § 2.1006 (applying "traditional discovery privileges" in the pre-license disclosure process). On February 2, 2006, the NRC reversed the PAPO Board's order, finding that the application was not "documentary material" within the meaning of 10 C.F.R. § 2.1001. NRC Order, 2006 WL 1704522, at *11. In light of this holding, the Commission did not examine the issue of the applicability of litigation privileges. The State of Nevada did not seek judicial review of this decision.

Meanwhile, however, prior to the Commission's reversal of the PAPO Board, the State of Nevada sent another FOIA request to the DOE for the draft applications on November, 25, 2005. (Ex. A, Complaint (# 1).) It is the denial of this request that is specifically challenged in this case. The state's request noted that the PAPO Board had found that the draft application was not privileged and sought the Bechtel draft of July 26, 2004, as well as the "September 2004 interim iteration of the draft License Application." (*Id.*) Mr. Arthur responded with a letter denying the request on December 28, 2005, invoking the deliberative process and work product privilege, and mentioning the attorney-client privilege in passing as well. (Ex. B, Complaint (# 1).) The State of Nevada administratively appealed on January 26, 2006 to the Department of Energy's Office of Hearings and Appeals, listing as its grounds for appeal: (1) incorrect assertion of work-product exemption, (2) inadequate description of withheld documents, (3) failure to segre-

---

**7.** Although only relevant to the issues in this case by way of background, "documentary material[s]" are defined as by the regulations as follows:

(1) Any information upon which a party, potential party, or interested governmental participant intends to rely and/or to cite in support of its position in the proceeding for a construction authorization for a high-level radioactive waste repository at a geologic repository operations area ...

(2) Any information that is known to, and in the possession of, or developed by the party that is relevant to, but does not support, that information or that party's position; and

(3) All reports and studies, prepared by or on behalf of the potential party, interested governmental participant, or party, including all related "circulated drafts," relevant to both the license application and the issues set forth in the Topical Guidelines in Regulatory Guide 3.69 ....

10 C.F.R. § 2.1001. As the DOE points out, the State of Nevada's position was, in part, that comparing final and draft applications will reveal information that "does not support" the application, *see id.* § 2.1001(2), and the PAPO Board agreed. PAPO Order, 2005 WL 5716382.

gate deliberative process material from non-exempt material, and (4) failure to weigh the public interest. (Ex. C, Complaint (# 1).) The decision of the Office of Hearings and Appeals affirming the denial stated:

> Turning to the documents at issue in the present case, we find that the very nature of the draft license application withheld by [the DOE] under Exemption 5 suggests that significant portions of these documents are clearly factual. In most cases, we would remand this matter ... for a segregation analysis. However, in the present case we have found ... that both drafts may be withheld in their entirety under the attorney work product privilege.

(Ex. D at 5, Complaint (# 1).) Thus, the Office of Hearings and Appeals might have remanded based solely on the deliberative process privilege, but it reasoned that the adversary hearing was an "administrative litigation proceeding" that rendered the draft application "attorney work product." (*Id.* at 6.)

The State of Nevada filed this action challenging the DOE's denial of its request on March 22, 2006. (Complaint (# 1).) The Defendants filed their Motion for Summary Judgment (# 24) on July 28, 2006. Plaintiff then sought and was granted discovery (## 30, 36), and it filed its Opposition (# 40) to Defendants' motion (# 24), as well as its own Motion for Summary Judgment (# 39) on January 31, 2007. Defendants filed their Opposition (# 41) to Plaintiff's motion, which was also their Reply (# 41) in support of summary judgment, on March 30, 2007. Plaintiff filed its Reply (# 42) in support of its motion (# 39) on April 13, 2007. On June 27, 2007, the DOE filed two additional exhibits under the caption Defendant's Supplemental Submissions of Supporting Materials (# 45). The Court heard oral argument on July 25, 2007 (## 46, 47).

## II. FOIA

Unlike a typical suit against a government agency, FOIA provides that "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). "Courts must apply that burden with an awareness that the plaintiff, who does not have access to the withheld materials, is at a distinct disadvantage in attempting to controvert the agency's claims." *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir.1997) ("*Maricopa II* ") (internal quotations omitted). The agency may only sustain its burden by proving that materials withheld fall within one of nine statutory exemptions and the court will review the agency's decision not to disclose the information *de novo.* 5 U.S.C. § 552(a)(4)(B) and (b). The "basic policy" of FOIA is one of disclosure. *NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 220, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) ("disclosure, not secrecy, is the dominant objective of the Act"). "Because FOIA's purpose is to encourage disclosure, its exemptions are to be narrowly construed," *Carter v. Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir.2002), and there is a "strong presumption in favor of disclosure." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991).

In addition to naming the nine statutory exemptions, section 552(b) provides in relevant part:

> Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted shall be indicated on the

released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted shall be indicated at the place in the record where such deletion is made.

5 U.S.C. § 552(b). A district court must make "make specific findings on the issue of segregability." *Wiener v. F.B.I.*, 943 F.2d 972, 988 (9th Cir.1991).

 "Ordinarily, the government must submit detailed public affidavits identifying the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption. This submission is commonly referred to as a '*Vaughn*' index." [8] *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004) (citations omitted); *see Vaughn v. Rosen*, 484 F.2d 820, 823–25 (D.C.Cir. 1973). "Because the court and the plaintiff do not have the opportunity to view the documents themselves, the submission must be 'detailed enough for the district court to make a *de novo* assessment of the government's claim of exemption.' " *Lion Raisins*, 354 F.3d at 1082 (quoting *Maricopa Audubon Soc'y*, 108 F.3d at 1092).[9] An agency "need not specify its objections to disclosure in such detail as to compro-

mise the secrecy of the information." *Lewis v. Internal Revenue Serv.*, 823 F.2d 375, 378 (9th Cir.1987) (quoting *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 742 (9th Cir.1979)) (brackets omitted). The index requirement serves to allow the requestor to contest through the adversarial process the contention that a document falls under an exemption and prevents burdensome and non-adversarial *in camera* review of *ex parte* submissions from becoming the norm. *See Wiener*, 943 F.2d at 977.[10] The requirement may also be met via equivalent public testimony from appropriate witnesses, or via an affidavit. *Schiffer v. F.B.I.*, 78 F.3d 1405, 1408–09 (9th Cir.1996); *Lewis*, 823 F.2d at 378.

The Ninth Circuit has not stated that there is a general presumption of good faith in an agency's affidavits, although other courts have applied such a presumption *once the agency has otherwise met its burden*:

> Ordinarily, the agency may justify its claims of exemption *through detailed affidavits*, which are entitled to a presumption of good faith. [*Jones v. FBI*, 41 F.3d 238, 242 (6th Cir.1994) ] (citing *United States Dep't of State v. Ray*, 502 U.S. 164, 179, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991)). Evidence of bad faith on the part of the agency can overcome this

---

**8.** "[A] *Vaughn* index is not required where it is not needed to restore the traditional adversary process," *Wiener*, 943 F.2d at 978 n. 5, as where an entire class of documents is *per se* exempt from disclosure. *Id.*; *see also Fidducia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1042–43 (9th Cir.1999) ("[O]ur precedents plainly hold that neither a *Vaughn* index nor an affidavit is necessarily required in all cases, though either or both (or more, as when a judge requires an *in camera* review) may be required in any particular case, depending on the circumstances.") (footnote omitted).

**9.** "A *Vaughn* Index must: (1) identify each document withheld; (2) state the statutory exemption claimed; and (3) explain how disclosure would damage the interests protected by the claimed exemption." *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1326 n. 1 (9th Cir.1995).

**10.** *See also Vaughn*, 484 F.2d at 826 (noting that without an index requirement, "there are no inherent incentives that would affirmatively spur government agencies to disclose information.... [and] agencies lose very little [in FOIA litigation] by refusing to disclose documents").

presumption, even when the bad faith concerns the underlying activities that generated the FOIA request rather than the agency's conduct in the FOIA action itself. *Id.* at 242–43. Unless evidence contradicts the government's affidavits or establishes bad faith, the court's primary role is to review the adequacy of the affidavits and other evidence. [*Ingle v. Dep't of Justice,* 698 F.2d 259, 265 (6th Cir.1983), overruled on other grounds by *U.S. Dep't of Justice v. Landano,* 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993) ] (quoting *Cox v. United States Dep't of Justice,* 576 F.2d 1302, 1312 (8th Cir.1978)); *Silets v. United States Dep't of Justice,* 945 F.2d 227, 231 (7th Cir.1991) (citing *Kimberlin v. Department of Treasury,* 774 F.2d 204 (7th Cir.1985)). "If the Government fairly describes the content of the material withheld and adequately states its grounds for nondisclosure, and if those grounds are reasonable and consistent with the applicable law, the district court should uphold the government's position." *Ingle,* 698 F.2d at 265 (quoting *Cox,* 576 F.2d at 1312).

*Rugiero v. U.S. Dep't of Justice,* 257 F.3d 534, 543–544 (6th Cir.2001) (emphasis supplied). *See also Ray,* 502 U.S. at 179, 112 S.Ct. 541 ("We generally accord Government records and official conduct a presumption of legitimacy."). In light of the Defendants' reliance on this presumption, we note that it is not meant to supplant the burden that is otherwise placed on the agency by sanctioning sweeping and conclusory affidavits. It is not a surrogate for the evidence required for a court to conduct its review *de novo. See Berman v. C.I.A.,* 501 F.3d 1136, 2007 WL 2472858, 1139–41 (9th Cir.2007) (holding that even where deference is "broad," "[t]he CIA must do more than show simply that it has acted in good faith"); *Wiener,* 943 F.2d at 983 n. 19.

A district court may undertake *in camera* review of information the government claims is exempt from disclosure, but "the district court's inspection prerogative is not a substitute for the government's burden of proof." *Maricopa Audubon Soc'y,* 108 F.3d at 1093 n. 2 (quoting *Church of Scientology,* 611 F.2d at 743). "[A] district court may rely solely on *ex parte* affidavits 'only in the exceptional case' and only after 'the government has submitted as detailed public affidavits and testimony as possible.'" *Lion Raisins,* 354 F.3d at 1083 (quoting *Doyle v. F.B.I.,* 722 F.2d 554, 556 (9th Cir.1983)).

Finally, FOIA provides a comprehensive scheme governing disclosure to the public. *Maricopa Aud. Soc'y v. U.S. Forest Serv.,* 108 F.3d 1082, 1088 nn.4–5 (9th Cir.1997). A district court lacks authority to either require or deny disclosure outside of the specific statutory exemptions FOIA provides. *Id.* Generally, the identity of a requestor and the purpose for which a document is sought are both simply irrelevant. *See id.* at 1088 n.5 ("the Supreme Court has repeatedly recognized that FOIA is 'clearly intended ... to give any member of the public as much right to disclosure as one with a special interest' in a particular document") (quoting *Dep't of Def. v. Fed. Labor Rel'ns Auth.,* 510 U.S. 487, 495–97, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994) (omission in original)). "Because Congress clearly intended the FOIA to give any member of the public as much right to disclosure as one with a special interest in a particular document, except in certain cases involving claims of privilege, the identity of the requesting party has no bearing on the merits of his or her FOIA request[.]" *Fed. Labor Rel'ns Auth.,* 510 U.S. at 496, 114 S.Ct. 1006 (citations, prior quotations, and brackets omitted).

## III. FOIA and Summary Judgment

*Vaughn* and its progeny impose procedural requirements on the government pe-

culiar to the FOIA context. There is no rule implementing these procedures, however, and FOIA cases are very frequently decided on summary judgment. *See Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 919 (9th Cir. 1992). A district court must ensure that it has "an adequate factual basis for its decision," *Lion Raisins*, 354 F.3d at 1078, but a full blown trial in the conventional sense would be an oddity in a FOIA case.[11]

From the *district court's* perspective, we have limited guidance on the standard for summary judgment in the FOIA context from the Ninth Circuit. In *Professional Programs Group v. Department of Commerce*, the Ninth Circuit distinguished the burden "at trial" in a FOIA case, which is on the government, from the plaintiff's burden at summary judgment. 29 F.3d 1349, 1353–54 (9th Cir.1994).[12] The *Pro-fessional Programs Group* court then went on to state that for a plaintiff "to prevail on its summary judgment motion, [it] bears the burden of showing that there is an absence of evidence supporting the government's claimed exemption[,]" 29 F.3d at 1353–54; the opinion did not spell out what constituted "an absence" of adequate evidence in the unique FOIA context.[13]

We are persuaded that the D.C. Circuit authority that the parties have cited, and which is not in apparent conflict with Ninth Circuit precedent, states the correct standard: "In a suit brought to compel production, an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements." *Students Against Geno-*

11. *See* 1 James T. O'Reilly, *Federal Information Disclosure* § 15:66 (3d Ed.2000) (stating from a litigants perspective that "[a]fter litigation proceeds ... options are (1) requests for a special master to review the document, (2) in camera inspection[,] ... and (3) requests for the in camera review of a representative sample document from each class[, which is] ... valuable but uncommon. Depositions of agency employees may be used ... in exemption (b)(5) cases probing predecisional status of withheld records.") (footnotes omitted); P. Stephen Gidiere, *The Federal Information Manual* § 9.3.2.4 (2000) (noting with respect to FOIA that district courts routinely appoint special masters under Federal Rule 53 to review voluminous claims of privilege). Of course, evidentiary hearings may be required in some cases. *See, e.g., Nat'l Parks and Conservation Ass'n v. Kleppe*, 547 F.2d 673, 675 (D.C.Cir.1976).

12. *But cf. Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C.Cir. 1992) (noting that under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a court must "view the evidence presented through the prism of the substantive evidentiary burden" at summary judgment, *id.* at 248, 106 S.Ct. 2505, and that the burden in a FOIA case is on the government). Ordinarily, "[a] moving party *without* the ultimate burden of persuasion at trial ... [still] has *both* the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000) (emphasis supplied). On the other hand, ordinarily the whole notion of a trial is not problematic and it is well established that a party seeking to avoid production of evidence based on an evidentiary privilege bears the burden of persuading the court that the privilege applies. *See, e.g., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir.1997); *S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 549 (D.Ariz.2002).

13. Focusing chiefly on the *appellate* standard of review, the Ninth Circuit has repeatedly recognized that the "unique nature" of FOIA suits impacts how motions for summary judgment are treated. *E.g. Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir.1996). At least part of this "unique nature" derives from the fact that a plaintiff's FOIA claim is based on information the plaintiff does not have. *See Maricopa II*, 108 F.3d at 1092; *Wiener*, 943 F.2d at 977.

*cide v. Dep't of State*, 257 F.3d 828, 833 (D.C.Cir.2001) (internal quotations and alterations omitted). On the other hand, "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption, summary judgment in favor of the FOIA plaintiff is appropriate." *Petroleum Info. Corp.*, 976 F.2d at 1433. We note, however, that in our view the agency's "version of the facts" must normally be supported by more than conclusory affidavits, even at summary judgment. *Vaughn* and its progeny were not designed to provide an additional staging point for administrative intransigence. *Vaughn*, 484 F.2d at 826. *Cf. Lion Raisins*, 354 F.3d at 1082.

## IV. Exhaustion

■ As an initial matter, Defendants argue that the Court should not reach the merits because Plaintiff did not exhaust its remedies before the DOE. "Exhaustion of a parties' administrative remedies is required under the FOIA before that party can seek judicial review." *In re Steele*, 799 F.2d 461, 465 (9th Cir.1986). "Where no attempt to comply fully with agency procedures has been made, the courts will assert their lack of jurisdiction under the exhaustion doctrine." *Id.* at 466.

■ Defendants have not cited any agency procedures that the Plaintiff failed to comply with. In their Reply (# 41) and at oral argument, Defendants asserted that the failure to appeal the first FOIA request should bar subsequent requests for the same material. This argument appears to confuse exhaustion with claim preclusion, which are not the same. In

any case, Congress clearly intended that FOIA requestors comply with published regulations establishing the proper procedure for requests. *See* 5 U.S.C. § 552(a)(3)(A) ("upon any request for records which (I) reasonably describes such records and (ii) is made in accordance with *published* rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person") (emphasis supplied). Defendants essentially ask us to adopt a rule of administrative procedure on behalf of the agency and then apply it retroactively. We decline to do so.[14] Nor, however, is the purpose of the requirement that a party exhaust remedies triggered when the Office of Hearings and Appeals considered and denied the request on the merits. *See Woodford v. Ngo*, — U.S. —, 126 S.Ct. 2378, 2385, 165 L.Ed.2d 368 (2006) (exhaustion is required in order "to give the agency a fair and full opportunity to adjudicate ... claims," and it thus requires "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotations omitted).

Defendants also assert that the State of Nevada did not argue that the deliberative process privilege does not apply to the draft applications as a whole. This issue is a straw man largely of Defendants' own construction. The State of Nevada's position is that the deliberative process privilege cannot apply to the drafts as a whole, not that it does not apply to the documents at all. In keeping with this position, the grounds for administrative appeal were included the following arguments: "(1) Incorrect Assertion of Work-product Exemption," "(2) Inadequate Description [of

---

**14.** The question of what the appropriate rule should be is not a simple one. While a requestor should not be allowed simply to repeat itself, strictly speaking, that did not occur here. In some instances, a requestor will

not even know that a request is repetitive. Moreover, it seems apparent to the Court that the second request was partially based on what Plaintiff believed to be changed circumstances.

Withheld Documents]," "(3) Failure to Segregate Deliberative–Process Material from Non-exempt Material," and "(4) Failure to Weigh the Public Interest." (Ex. C, Complaint (# 1).)

We find Defendants' arguments that Plaintiff has not exhausted its remedies to be meritless.

## V. Exemption 5

"Exemption 5," the only FOIA exemption at issue in this case, protects from disclosure: "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "The primary purpose of ... Exemption 5[is] to enable the Government to benefit from 'frank discussion of legal or policy matters.'" *F.T.C. v. Grolier, Inc.*, 462 U.S. 19, 23, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 9 (1965)). "In keeping with the Act's policy of the fullest responsible disclosure, Congress intended Exemption 5 to be as narrow as is consistent with efficient Government operations." *Id.* (citations, quotations, and brackets omitted).[15]

Exemption 5 shields "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). The exemption thus covers the attorney-client privilege, the executive "deliberative process" privilege, and the "work product" privilege. *Maricopa II*, 108 F.3d at 1092.

The DOE asserts the work product and deliberative process privileges in refusing to disclose any part of the draft applications.

### A. Work Product

Preliminarily, the work product doctrine does not have the same scope under FOIA as it has in other litigation contexts. Under Federal Rule of Civil Procedure 26(b)(3), the privilege given to "work product" is qualified rather than absolute. "[U]pon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means," the privilege does not apply. *Id.*[16] In the context of FOIA, however, the Supreme Court has emphasized that the test is whether the documents would "normally" be privileged, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 148–49, 95 S.Ct. 1504, and commenting specifically on Rule 26(b)(3), Fed. R.Civ.P., the Supreme Court has stated: "It makes little difference whether a privilege is absolute or qualified in determining how it translates into a *discrete category* of

---

**15.** "To qualify [for Exemption 5], a document must ... satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Although the source of the Bechtel draft was possibly not, strictly speaking, the agency, the State of Nevada does not argue that this fact removes it from possible Exemption 5 coverage. In some circumstances where a document is produced by a contractor or consultant for an agency, courts have deemed it an "intra-agency" document. *See, e.g., Hoover v. U.S. Dep't of Interior*, 611 F.2d 1132, 1137–38 (5th Cir.1980) (holding that an appraisal by an outside expert is an intra-agency memorandum).

**16.** Nevertheless, "opinion" work product, as opposed to "ordinary work product," is afforded near absolute protection in most cases. *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir.1992) (discussing exceptions to the general rule).

documents that Congress intended to exempt from disclosure under Exemption 5. Whether its immunity from discovery is absolute or qualified, a protected document cannot be said to be subject to 'routine' disclosure." *Grolier,* 462 U.S. at 27, 103 S.Ct. 2209 (emphasis supplied). Accordingly, any issue of substantial need disappears when work product is considered as a categorical exemption under FOIA. Additionally, although the Advisory Committee explicitly contemplated redaction as a course of action in adopting the rule,[17] most recent decisions have held (and the parties do not dispute) that there is no need to consider segregability of work product in the context of Exemption 5. *See Judicial Watch, Inc. v. Dep't of Justice,* 432 F.3d 366, 371 (D.C.Cir.2005); *Feshbach v. S.E.C.,* 5 F.Supp.2d 774, 783–84 (N.D.Cal.1997).[18]

 "The work product doctrine preserves a 'zone of privacy' in which a party, his attorney, and in many cases his non-attorney 'representative' can prepare for litigation, 'free from unnecessary intrusion by his adversaries.'" *In re Grand Jury Subpoena,* 220 F.R.D. 130, 141 (D.Mass.2004) (quoting *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir. 1998)). "[T]o qualify for protection against discovery under Rule 26(b)(3), documents must have two characteristics: (1) they must be 'prepared in anticipation of litigation or for trial,' and (2) they must be 'prepared by or for [the] party [seeking the protection] or by or for that ... party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)* (*"Torf"*), 357 F.3d 900, 907 (9th Cir.2004) (quoting Fed.R.Civ.P. 26(b)(3)) (citations omitted).

In *Torf,* the Ninth Circuit adopted the "because of" standard for "anticipation of litigation": "A document should be deemed prepared 'in anticipation of litigation' and thus eligible for work product protection under Rule 26(b)(3) if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" *Id.* at 907 (quoting 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice & Procedure* § 2024 (2d ed.1994)). *Torf* further elaborates that:

> [t]he "because of" standard does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created because of anticipated litigation, and *would not have been created in substantially similar form but for the prospect of that litigation* [.]"

*Id.* at 908 (quoting *Adlman,* 134 F.3d at 1195) (emphasis supplied).

Rule 26(b)(3) is not *normally* intended to protect "materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes."[19] Fed.R.Civ.P. 26(b)(3) advisory committee note (1970). *Torf* makes clear, however, that the "substantially similar form" test potentially provides a limited exception to the general rule, and that some "dual purpose" documents will be covered by the privilege. We do not view

---

17. *See* Fed.R.Civ.P. 26(b)(3) advisory committee's note (1970).

18. *But see Deering Milliken, Inc. v. Irving,* 548 F.2d 1131, 1138 (4th Cir.1977).

19. *See Adlman,* 134 F.3d at 1195; *Pac. Gas & Elec. v. United States,* 69 Fed.Cl. 784, 792 (2006) (both collecting cases).

the "substantially similar form" test as trivial. Although the "but for" component of that test would appear to require, in the legal vernacular, mere "cause in fact," *Torf*'s test also requires that the effect on the form of the document be both demonstrable and substantial. Thus, in adopting the test, the Ninth Circuit observed that "[w]hen there is a true independent purpose for creating a document, work product protection *is less likely ..." Torf,* 357 F.3d at 908 (emphasis supplied). In concluding that the privilege applied on *Torf*'s facts, the Ninth Circuit stated that "[t]he documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose *so permeates any non-litigation purpose that the two purposes cannot be discretely separated* from the factual nexus as a whole." *Id.* at 910 (emphasis supplied).

Whether administrative proceedings can be considered "litigation," thus triggering the work product privilege, depends upon whether the proceedings are adversarial. *See, e.g., In re Grand Jury Subpoena,* 220 F.R.D. at 146–47 (" 'Litigation' includes civil and criminal trial proceedings, as well as adversarial proceedings before an administrative agency, an arbitration panel or a claims commission, and alternative-dispute-resolution proceedings such as mediation or mini-trial.... In general, a proceeding is adversarial when evidence or legal argument is presented by parties contending against each other with respect to legally significant factual issues. Thus, an adversarial rulemaking is litigation for purposes of the immunity.") (quoting Restatement (Third) of Law Governing Lawyers § 87 cmt. h (1998)); *S. Union Co.,* 205 F.R.D. at 549 (stating that an adminis-

trative hearing constitutes litigation if there is a right to cross examination).[20]

■■■ In arguing that the anticipated adversary hearing renders these documents work product, Defendants initially analogize the draft application to a draft complaint, which is clearly covered by the work product privilege. (DMSJ (# 24–1) 20–21.) Under this analysis, we would not even need to reach the issue of whether the application were dual purpose documents. They would quite simply be litigation documents.

We are persuaded by the reasoning of the Court of Federal Claims in a recent case that addressed this exact issue. *See Pac. Gas and Elec. Co. v. United States,* 69 Fed.Cl. 784 (2006). Notably, the federal government substantially prevailed in that discovery dispute by making a quite different argument than it makes here. The Court of Federal Claims reasoned:

> Plaintiff's analogy—comparing license and permit application proceedings to litigation such as that in this case—has the appeal of an easy and universally applicable solution to the current dispute, but it ultimately fails to convince. In order to attempt to achieve its "ultimate objective [of] obtaining a damages recovery" here, plaintiff had to file a complaint *against* the United States Government, the opponent from which it seeks to obtain a damages recovery. The "ultimate objective" of this litigation, therefore, is adversarial—to win damages from an opposing party against whom plaintiff has served a complaint. There would be no "litigation," nor would this court have jurisdiction, without an adversarial claim against plaintiff's opponent, the United States Government. By contrast, in a license or

---

**20.** *But cf. In re Grand Jury,* 112 F.3d at 924–26 (rejecting the President and First Lady's claim to the work product privilege based on the prospect of Congressional hearings, and noting that the Restatement appeared to take a contrary view).

permit application proceeding or a public utilities rate case, the "ultimate objective" is not adversarial—rather, it is to set rates with or obtain a license or permit from a regulatory body in order to advance the applicant's business or comply with regulations. In a license or permit filing, plaintiff does not file a complaint *against* an opponent, but rather files an application *for* the license or permit with a neutral regulatory commission. Therefore, the court disagrees that filings before these administrative proceedings "are akin to complaints in litigation before this [c]ourt."

*Id.* at 800–01 (citations to court's record omitted) (alterations and emphasis in original). As Plaintiff pointed out at oral argument, insofar as there is a good analogy to a litigation complaint in these NRC proceedings, it would appear to be the adversarial contentions that the parties to the hearing are required to file in anticipation of the hearing rather than the non-adversarial license application. *See* 10 C.F.R. § 2.309(a).[21]

Defendants also argue that the adversarial nature of the hearing, and apparently the controversy over the project as a whole, renders the applications work product. This, unlike the complaint analogy, amounts to an argument that the license applications are dual purpose documents. We need not linger over Defendants' argu-

ments and evidence presented to demonstrate what Plaintiff actually concedes—the hearing and related procedures will be adversarial. *See* 10 C.F.R. § 2.300 *et seq.* Rather, the real question at issue is how large a shadow the adversarial hearing casts in this extensive licensing process. Insofar as Defendants' argument implies that the entirety of the Yucca Mountain licensing endeavor can be considered work product in light of the fact that there will be an adversarial hearing,[22] we agree with Plaintiff that the privilege cannot extend that far. The entirety of the licensing process is simply not adversarial, *Pacific Gas & Elec.,* 69 Fed.Cl. at 808, nor could the entire process pass the substantially similar form test, nor is the extension of the privilege that far otherwise warranted. *Cf. United States v. Frederick,* 182 F.3d 496, 501–02 (7th Cir.1999) (declining to allow the work product doctrine to create an accountant's privilege).[23]

Beyond pointing to the adversarial nature of the hearing and the general controversy over the project at oral argument, Defendants have not substantively addressed the "substantially different form" test. In considering the totality of the circumstances, we are unable to find any basis to conclude that the applications "would not have been created in substantially similar form but for the prospect of that litigation." *Torf,* 357 F.3d at 908.

---

**21.** Because *Pacific Gas & Electric* partially relied on the informal nature of NRC license application regulations, 69 Fed.Cl. at 803, an argument could be made that either the adversarial nature of parts of Subpart J, 10 C.F.R. § 2.1000 *et seq.,* or the semi-formal nature of pre-application site characterization, *see* 10 C.F.R. § 63.16(c), (d), (e) and (f), distinguish this case. Defendants do not make this argument and we find no reason why these regulations change the basically non-adversarial nature of the license application.

**22.** At oral argument, Defendants hesitated to endorse, but also notably refused to disavow this proposition. (Hearing Trans. (# 38) 11–12.)

**23.** Although the "attorney" work product doctrine of *Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947), has evolved into the "litigation" work product doctrine of Rule 26(b)(3), Fed.R.Civ.P., *Frederick* embodies the caution with which courts have maintained in extending the traditional doctrine.

First, the contents of the application is for the most part governed by the detailed regulation that the application must comply with. *See* 10 C.F.R. § 63.21. Second, we cannot presume that the agency would fail to do its job without being challenged through an adversarial process, for example by failing to answer hypothetical objections to the project absent a hearing. *Cf. Ray,* 502 U.S. at 179, 112 S.Ct. 541. The fact that the project is both controversial and a matter of public importance bolsters our conclusion that the agency will likely do its job. In sum, there is simply no basis on this record to conclude that the applications are work product.

## B. The Deliberative Process Privilege

To reiterate, the State of Nevada argues not that the deliberative process does not apply at all, but rather that the DOE cannot apply the privilege to the draft applications as a whole. It argues that the DOE must disclose at least some of the merely factual components of the draft applications after engaging in a proper segregation analysis. Defendants argue that revealing any part of the document would interfere with and reveal the DOE's deliberative processes.

■ "The purpose of [the deliberative process] privilege is 'to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny.'" *Carter,* 307 F.3d at 1089 (quoting *Assembly,* 968 F.2d at 920). The privilege "[t]hus ... covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* (quoting *Klamath,* 532 U.S. at 8, 121 S.Ct. 1060). In order to be covered documents must be both (1) predecisional and (2) deliberative. *Id.*

■ There appears to be no dispute in this case that the draft applications were predecisional. The DOE has not yet filed its application to the NRC. In evaluating whether a document is deliberative:

We must ... focus on the effect of the materials' release: the key question in Exemption 5 cases is whether the disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions. Thus, predecisional materials are privileged to the extent that they reveal the mental processes of decisionmakers.

*Carter,* 307 F.3d at 1090 (citations, quotations, and brackets omitted).

In *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Supreme Court stated:

It appears to us that Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies. And, as noted, that approach extended and continues to extend to the discovery of purely factual material appearing in those documents in a form that is severable without compromising the private remainder of the documents.

*Id.* at 91, 93 S.Ct. 827. In *National Wildlife Federation v. U.S. Forest Service,* 861 F.2d 1114 (9th Cir.1988), however, the Ninth Circuit followed the D.C. Circuit in holding that purely factual material could be privileged if revealing the material "would reveal the process by which agency officials make these determinations, whether or not the documents themselves contain facts on non-binding recommenda-

tions regarding law and policy." *Id.* at 1119 (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C.Cir.1982)). "Under this 'process-oriented' or 'functional' test .... [f]actual materials ... would ... be exempt from disclosure to the extent that they reveal the mental processes of decisionmakers." *Id.* at 1119.[24]

There is some variance in the approaches that courts have taken toward draft documents and the deliberative process privilege. In *National Wildlife Federation*, the Ninth Circuit held that draft Environmental Impact Statements and forest plans were at least partially privileged. The Court reached this decision only after the forest service had already released redacted copies of the drafts and after the withheld information had been reviewed *in camera*. *Nat'l Wildlife Fed'n*, 861 F.2d at 1115–6. In summarizing the D.C. Circuit's approach to the deliberative process privilege, however, the Ninth Circuit quoted the D.C. Circuit's broad statement that the deliberative process privilege "cover[s] all 'recommendations, draft documents, proposals, suggestions and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency,' as well as documents which would 'inaccurately reflect or prematurely disclose the views of the agency.'" *Id.* at 1119–20 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980)).

Relying on this same language in *Coastal States*, at least one court appears to have held that all draft documents are *per se* deliberative because they are predecisional. *See Hamilton Sec. Group Inc. v. Dep't of Housing and Urban Development*, 106 F.Supp.2d 23, 31–32 (D.D.C. 2000) (construing *Coastal States* as a decision that litigants should not "parse" and holding that draft audit reports were privileged).[25] *But see Heartwood, Inc. v. U.S. Forest Serv.*, 431 F.Supp.2d 28, 37–38 (D.D.C.2006) (holding that an advisory committee's draft ecological assessments were not privileged because they were not deliberative within the meaning of the privilege). With respect to purely factual information *that will not reveal the mental processes of the agency*, however, the Ninth Circuit has explicitly rejected the argument that whatever is not the "final agency position" must be deliberative. *See Carter*, 307 F.3d at 1092 (holding that FOIA compelled the Department of Commerce to release Census data that adjusted for systemic undercounts and stating "any concerns with public confusion caused by release of erroneous information could be allayed by warning FOIA requesters that the information is unofficial and disclaiming responsibility for 'any errors or gaps'.") (citing *Petroleum Info. Corp.*, 976 F.2d at 1437). We recognize that the analysis required for the predecisional and deliberative elements will sometimes "overlap," *Carter*, 307 F.3d at 1089, but we

---

**24.** Concurring in the judgment, Judge Pregerson noted that he did not believe it was the intent of the opinion writers to allow Exemption 5 to "swallow[ ]" FOIA by allowing everything purely factual to be withheld so long as it was related, as it almost always would be in some sense, to the process by which policies are formulated. *Id.* at 1124 (Pregerson, J., concurring in the judgment). The expansion of the deliberative process privilege via "doctrinal creep" has been the subject of some blistering commentary. *See* 26A

Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure: Evidence* § 5680 (1992).

**25.** We note that the FOIA plaintiff prevailed on appeal in *Coastal States*, and that rather than simply holding that all predecisional documents are deliberative, the D.C. Circuit engaged in a fairly extensive discussion of the hallmarks of deliberative documents. 617 F.2d at 866.

conclude that the word "draft" is not talismanic and that a meaningful inquiry into the nature of such a document is required.

In some circumstances, the mere editing of factual material may constitute a policy-making process which is deliberative and therefore privileged. In two very similar cases, the D.C. Circuit held that draft histories of the Vietnam War used to inform future policy decisions were privileged on this basis. *Russell v. Dep't of the Air Force*, 682 F.2d 1045 (D.C.Cir.1982); *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565 (D.C.Cir.1987). In *Russell*, the D.C. Circuit found that the draft history need not be disclosed because "a simple comparison between the pages sought and the official document would reveal what material supplied by subordinates [sic] senior officials judged appropriate for the history and what material they judged inappropriate." 682 F.2d at 1049. Reviewing these decisions subsequently, the D.C. Circuit noted that the editorial selection of facts in the Air Force history cases was "not 'essentially technical' in nature; ... rather [the facts] are part of processes with which the deliberative process privilege ... is centrally concerned." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C.Cir.1993) (prior brackets and citation omitted).

Defendants assert that the draft applications are being sought for a purpose that itself indicates the applicability of the privilege.[26] This is a weighty argument in light of Plaintiff's previous administrative contentions that the draft documents must be disclosed precisely for the purpose of probing discrepancies between the draft and the final application. *See* PAPO Order, 2005 WL 5716382, at *4 (concluding that previous drafts constituted "nonsupporting" documentary material, 10 C.F.R. § 2.1001(2), relative to the final application). Plaintiff attempts to outflank rather than respond to this argument directly, and its argument is also quite substantial: In light of the detailed requirements of 10 C.F.R. § 63.21,[27] the application must contain basic factual information that is technical in nature and that would have to be present *in any* application that the DOE would submit to the NRC. Plaintiff thus contends that the "the facts are not going to change," and the argument that the facts could be used to reconstruct the agency's internal deliberative process is simply, in Plaintiff's view, unconvincing. We also note that the four page declaration of Mr. Arthur, which basically says

---

**26.** Plaintiff's intent in seeking these documents is not *directly* relevant to Plaintiff's entitlement to these documents, but it certainly is circumstantial evidence of the effect of release of the documents. *See National Wildlife Fed'n*, 861 F.2d at 1122 ("To the extent that [plaintiff] seeks through its FOIA request to uncover any discrepancies between the findings, projections, and recommendations between the draft[s] ... prepared by lower-level ... personnel and those actually adopted ..., it is attempting to probe the editorial and policy judgment of the decision-makers.").

**27.** Plaintiff also suggests that The Yucca Mountain Review Plan (NUREG–1804, Final Rev. 2) ("YRMP"), (excerpts filed as Ex. C,

PMSJ (# 39)), indirectly imposes rigorous, specific requirements on the DOE. The YRMP is an approximately 400–page guidance document describing how the NRC will review the DOE's application for compliance with 10 C.F.R. § 63.21. *See* 68 Fed.Reg. 45086, 2003 WL 21754503 (July 31, 2003). Based on the limited briefing, we are unable to see how this document aids Plaintiff's argument. Nor is the largely illegible presentation slide, (Ex. A. PMSJ (# 39)), particularly illuminating, other than to indicate that the "the government has [not] submitted as detailed public affidavits and testimony as possible [without revealing privileged information]." *Lion Raisins*, 354 F.3d at 1083 (citation and internal quotations omitted).

that teams have worked on both documents, is simply insufficient evidence to otherwise conclude that the factual information required by the regulation is "inextricably intertwined" with policy judgments such that there is no information in the draft documents that would not be exempt from disclosure.[28] *See Judicial Watch,* 432 F.3d at 372 ("[f]actual material is not protected under the deliberative process privilege unless it is 'inextricably intertwined' with the deliberative material").

There are four basic problems, however, with Plaintiff's argument. First and foremost, the documents that Plaintiff seeks are applications for a license for an installation that does not yet exist. Although 10 C.F.R. § 63.21 requires some raw factual information about the Yucca Mountain site—for example, "[i]nformation regarding the geology, hydrology, and geochemistry of the site, including geomechanical properties and conditions of the host rock," 10 C.F.R. § 63.21(c)(1)(ii)—the vast majority of the regulation requires information regarding DOE's *prospective* design proposals. In fact, 10 C.F.R. § 63.21(c)(1)(ii) and (iii) appear to be the *only* sub-sections of this regulation that do not *explicitly* involve the DOE's prospective plans. These prospective proposals involve more than the raw factual data at issue in *Carter* and *Petroleum Information Corporation,* and merely by virtue of outlining the proposed operation of a major new installation, they will necessarily involve policy judgments. Second, to the extent that the regulation requires raw factual information, the regulation also requires that the DOE exercise discretion regarding the scope of what information to include and analyze. *See* 10 C.F.R. § 63.21(c)(1) (requiring "[a] description of the Yucca

Mountain site, with *appropriate attention* to those features, events, and processes of the site that might affect design of the geologic repository operations area and performance of the geologic repository") (emphasis supplied). Third, and relatedly, the arrangement, inclusion, and exclusion of purely factual information may reveal editorial changes in emphasis. *Russell,* 682 F.2d at 1049. Fourth, and crucially for the ultimate disposition of this case, at least where draft documents involve significant policy judgments, an agency will not be in a position to protect itself from revealing its internal deliberative process via segregation when the final document has not even been created, approved, and released. In this respect, drafts of un-released documents and drafts of released documents are simply not the same.

In sum, Plaintiff seeks summary judgment largely based on the nature of the DOE's work in complying with 10 C.F.R. § 63.21. Based substantially on this same regulation, we come to the conclusion that FOIA does not compel that Defendants segregate "purely factual" information, and that Defendants are therefore entitled to summary judgment.

## VI. CONCLUSION

The brief and largely conclusory declaration submitted by Mr. Arthur gives us serious pause. We place little reliance on that declaration in reaching our decision, nor do we consider the generic burden of compliance to be a defense in a FOIA action outside of FOIA's statutory exemptions. However, having considered the nature of this administrative process and the arguments of the parties, this Court concludes that the deliberative process privi-

---

**28.** Nor does the affidavit indicate that the DOE actually undertook any segregation analysis, despite counsel's assertion, Reply

6(# 41), that the assertion of privilege on the whole document somehow constitutes a segregation analysis.

lege applies to the draft applications as a whole.

*IT IS, THEREFORE, HEREBY OR- DERED* that Defendants' Motion for Summary Judgment (# 24) is **GRANTED** and Plaintiff's Motion for Summary Judgment (# 39) is **DENIED.** The clerk shall enter judgment accordingly.